Filed 10/28/21  P. v. Iniguez CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. ANGEL VAZQUEZ INIGUEZ, Defendant and Appellant. | D079037 (Super. Ct. No. 18CR005434) |

APPEAL from a judgment of the Superior Court of Monterey County, Carrie M. Panetta, Judge.  Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, and Lisa Ashley Ott and Arthur P. Beever, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Angel Vazquez Iniguez of first degree murder (Pen. Code, § 187, subd. (a)), premeditated attempted murder (§§ 187, subd. (a), 664), assault with a semiautomatic firearm (§ 245, subd. (b)), and possession

of a firearm by a felon (§ 29800, subd. (a)(1)).[1]  It also found true various firearm enhancements.  (§§ 12022.5, subd. (a), 12022.53, subds. (c), (d), 12022.55.)  In bifurcated proceedings, Iniguez admitted suffering a prior "strike" conviction based on a juvenile delinquency adjudication for robbery. (§§ 211, 667.5, subd. (c).)  The trial court sentenced him to a total effective term of 89 years to life imprisonment.

Iniguez appeals.  He contends (1) the court erred by instructing the jury on murder based on the provocative act doctrine, (2) the court violated his constitutional right to trial by jury by using his juvenile adjudication for robbery to impose an increased sentence under the "Three Strikes" law, and (3) the court erroneously calculated his custody credits.  We disagree and affirm.

                                    FACTS

For purposes of this section, we state the facts in the light most favorable to the judgment.  (See *People v. Coleman* (2007) 146 Cal.App.4th 1363, 1366.)

In May 2018, a ranch owner hosted a large party for his niece's quinceañera.  The family hired seven security guards, most of whom were armed.  In two incidents, the security guards had to physically eject several people from the party for being drunk and disruptive.  A few individuals, including Giovanni Solis, had to be subdued by the security guards using pepper spray.  Solis was enraged and threatened to kill the security guards as his friends dragged him out.

After leaving the party, in a nearby parking lot, Solis repeatedly asked someone to call Iniguez.  Solis and Iniguez were close friends.  Eventually

---

1    Unless otherwise indicated, statutory citations are to the Penal Code.

2

someone dialed Iniguez and gave Solis the phone. Solis told Iniguez he had been pepper sprayed and Iniguez needed to come because "they did this to him." Iniguez was at home with his girlfriend at the time. Soon afterward, Josiah Marquez, another close friend of Iniguez, showed up at Iniguez's home. They left together in Iniguez's truck to meet up with Solis. Iniguez was driving, and Marquez was in the passenger seat.

When Iniguez and Marquez arrived at the parking lot, Iniguez spoke briefly with Solis. Iniguez then drove with Marquez onto the ranch. The ranch owner and two security guards were standing near the entrance. Iniguez pulled up quickly and stopped. When one security guard approached, Iniguez pointed a handgun at him and began firing. The security guard was hit in the arm and the buttocks. Iniguez kept firing (for a total of 12 shots), and the security guards returned fire (for a total of 31 shots). During the firefight, a bullet struck Marquez in the head and mortally wounded him.

Iniguez backed the truck toward the entrance, hit a fence, and then drove away. On the way home, Iniguez called his girlfriend, told her they had been "shot at," and asked her to call his parents.

Iniguez arrived home, and his parents arrived a few minutes later. Iniguez and his father moved Marquez from Iniguez's truck to Marquez's car. Iniguez told his mother they would take Marquez to the hospital. Iniguez's father left in Marquez's car, and Iniguez's mother followed in her van. Instead of going to a hospital, however, Iniguez's father parked the car on the street and left Marquez. He ran to the van, drove with Iniguez's mother to a drug store, and called 911 from a pay phone.

Police responded to Marquez's car. They discovered he was unconscious but still breathing. Marquez was taken to a hospital, but he died a few hours later. The cause of death was the gunshot wound to his head.

3

Iniguez and his family drove to Merced and then Las Vegas.  Iniguez told his girlfriend to have his truck repaired at a body shop.  It had several bullet holes and additional damage.  Police later found bloodstains on the front passenger seat and the passenger side floorboards.

At trial, Iniguez presented evidence that two people may have been sitting in the back seat of his truck during the shooting.  He also testified in his own defense.  He admitted driving to the ranch with Marquez.  He said he picked up Solis and another person in the parking lot outside.  When they drove up to the entrance, Solis began shooting from the back seat.  Iniguez said he did not know Solis was armed.  After the shooting stopped, Iniguez drove away, dropped off Solis and the other individual, and went home.  He did not call 911 for Marquez because he was scared the police would not believe his story.

## DISCUSSION

### I

### *Murder Under the Provocative Act Doctrine*

Iniguez first contends the court erred by instructing the jury on murder under the provocative act doctrine.  (CALCRIM No. 560.)  He argues that the provocative act doctrine was abrogated by Senate Bill No. 1437, which among other things amended the statutory malice requirement for murder.  (See § 188, as amended by Stats. 2018, ch. 1015, § 2.)  Several recent opinions have considered and rejected this argument.  (See *People v. Mancilla* (2021) 67 Cal.App.5th 854, 859 (*Mancilla*); *People v. Swanson* (2020) 57 Cal.App.5th 604, 608 (*Swanson*), review granted Feb. 17, 2021, S266262; *People v. Johnson* (2020) 57 Cal.App.5th 257, 261 (*Johnson*); *People v. Roldan* (2020) 56 Cal.App.5th 997, 1004-1005, review granted Jan. 20, 2021, S266031; *People v. Lee* (2020) 49 Cal.App.5th 254, 258 (*Lee*), review granted July 15,

4

2020, S262459; see also *People v. Soto* (2020) 51 Cal.App.5th 1043, 1059 (*Soto*), review granted Sept. 23, 2020, S263939.) We agree with these opinions and find Iniguez's argument unpersuasive.

The trial court instructed the jury on murder under the provocative act doctrine as follows: "The defendant is charged in Count 3 with murder. A person can be guilty of murder under the provocative act doctrine even if someone else did the actual killing. To prove that the defendant is guilty of murder under the provocative act doctrine, the People must prove that, one, in attempting to commit murder the defendant intentionally did a provocative act, two, the defendant knew that the natural and probable consequences of the provocative act were dangerous to human life and then acted with conscious disregard for life, three, in response to the defendant's provocative act someone else killed Josiah Marquez and, four, Josiah Marquez's death was the natural and probable consequence of the defendant's provocative act. [¶] A provocative act is an act whose natural and probable consequences are dangerous to human life because there's a high probability that the act will provoke a deadly response." (See CALCRIM No. 560.)

The court continued, "In order to prove that Josiah Marquez's death was the natural and probable consequence of the defendant's provocative act, the People must prove that, one, a reasonable person[] in the defendant's position would have foreseen that there was a high probability that his or her act could begin a chain of events resulting in someone's death. [¶] . . . [¶] Two, the defendant's act was a direct and substantial factor in causing Josiah Marquez's death and, three, Josiah Marquez's death would not have happened if the defendant had not committed the provocative act. [¶] A substantial factor is more than a trivial or a remote factor. However, it does

5

not need to be the only factor that caused the death." (See CALCRIM No. 560.)

We consider de novo the legal viability of the provocative act doctrine as described in the trial court's instructions. (See *People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We likewise independently interpret Senate Bill No. 1437 and its statutory amendments. (See *People v. Prunty* (2015) 62 Cal.4th 59, 71.)

Senate Bill No. 1437 reflected "a need for statutory changes to more equitably sentence offenders in accordance with their involvement in homicides." (Stats. 2018, ch. 1015, § 1, subd. (b).) It noted, "It is a bedrock principle of the law and of equity that a person should be punished for his or her actions according to his or her own level of individual culpability." (*Id.*, § 1, subd. (d).) As a result, the Legislature stated, "It is necessary to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (*Id.*, § 1, subd. (f).)

The Penal Code defines murder. "Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "[M]alice may be express or implied." (§ 188, subd. (a).) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (*Id.*, subd. (a)(1).) "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Id.*, subd. (a)(2).) "Implied malice does not require an intent to kill. Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to

6

human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653 (*Gonzalez*).)

Prior to Senate Bill No. 1437, a defendant could be liable for murder, even if he did not harbor express or implied malice, under the natural and probable consequences theory of aiding and abetting. (The same can be said of the felony-murder rule, but that rule and its newly-enacted limitations are not relevant here.) Under the natural and probable consequences theory, " ' "[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime." ' [Citation.] 'Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.' " (*People v. Chiu* (2014) 59 Cal.4th 155, 161.) "[C]ulpability under the natural and probable consequences theory does not require an accomplice to share the direct perpetrator's intent. Instead, '[a]ider and abettor culpability under the natural and probable consequences doctrine is vicarious in nature' and ' "is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense" ' may not be intended at all." (*People v. Gentile* (2020) 10 Cal.5th 830, 844 (*Gentile*).)

Thus, prior to Senate Bill No. 1437, "when a person aided and abetted a nonhomicide crime that then resulted in a murder, the natural and probable consequences doctrine allowed him or her to be convicted of murder without personally possessing malice aforethought. So long as the direct perpetrator possessed malice, and the killing was a natural and probable consequence of

7

the crime the defendant aided and abetted, it did not matter whether the defendant intended to kill or acted with conscious disregard for human life." (*Gentile*, *supra*, 10 Cal.5th at p. 845.)

Senate Bill No. 1437 amended section 188 to require that a defendant himself harbor express or implied malice in order to be convicted of murder (except in certain felony-murder situations not applicable here).  Amended section 188 provides, "Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  (§ 188, subd. (a)(3), as amended by Stats. 2018, ch. 1015, § 2.)  "The most natural meaning of this provision, construed in the context of Senate Bill 1437 as a whole and in the context of the Penal Code, bars a conviction for first or second degree murder under a natural and probable consequences theory.  Except for felony murder, section 188[, subdivision] (a)(3) makes personally possessing malice aforethought a necessary element of murder.  Natural and probable consequences liability for murder contains no such requirement." (*Gentile*, *supra*, 10 Cal.5th at p. 846.)

In Iniguez's view, the provocative act doctrine "impute[s]" malice on a defendant based solely on his participation in a crime and therefore runs afoul of amended section 188, subdivision (a)(3).  He is incorrect.  The provocative act doctrine requires proof that the defendant actually harbored malice.  Malice is not imputed to him, based on his participation in a crime or otherwise.  (*People v. Mejia* (2012) 211 Cal.App.4th 586, 603 ["With respect to the *mental* element of provocative act murder, a defendant cannot be vicariously liable; he must personally possess the requisite mental state of

malice aforethought when he . . . causes the death through his provocative act."].)

As our Supreme Court has explained, "A variation on the law of transferred intent, the provocative act doctrine holds the perpetrator of a violent crime vicariously liable for the killing of an accomplice by a third party, usually the intended victim or a police officer. . . . Under the provocative act doctrine, when the perpetrator of a crime maliciously commits an act that is likely to result in death, and the victim kills in reasonable response to that act, the perpetrator is guilty of murder. [Citations.] 'In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life.' [Citation.] [¶] *A murder conviction under the provocative act doctrine thus requires proof that the defendant personally harbored the mental state of malice*, and either the defendant or an accomplice intentionally committed a provocative act that proximately caused an unlawful killing." (*Gonzalez*, *supra*, 54 Cal.4th at pp. 654-655, fn. omitted, italics added.)

Iniguez cites *People v. Reed* (1969) 270 Cal.App.2d 37, 45, where the court used the term "impute[]" in the context of the provocative act doctrine: "Inasmuch as the killing here was committed by a police officer, it was proper for the court to instruct the jury on the law of *People v. Gilbert* [(1965) 63 Cal.2d 690 (*Gilbert*)], under which such a killing may be attributed to the defendant, as well as to instruct on the rule, also explained in *Gilbert*, which imputes malice, apart from the felony-murder rule." However, neither *Reed* nor *Gilbert* reflects "impute[d]" malice as that concept is used in the natural and probable consequences theory. Neither opinion requires proof of malice harbored by some other person that must be imputed to the defendant. Nor

9

is malice imputed to the defendant based solely on his participation in a crime. Both *Reed* and *Gilbert* confirm that a defendant himself must actually harbor malice for the provocative act doctrine to apply. (See *Gilbert*, at p. 704 ["In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life."]; *Reed*, at p. 44 [" 'As used in connection with murder, "malice" may be implied when the killing results from an act done by the defendant involving a high degree of probability that it will result in death, which act is intentionally done for a base, anti-social motive and with wanton disregard for human life.' "].)[2]

Iniguez argues that he "did not act with express or implied malice as to the homicide victim in this case." But the crime of murder does not require malice "as to" the person killed. If the defendant acts with malice, he is generally liable for the murder of those killed as a result of his acts, even if he did not harbor malice "as to" the persons killed. (See, e.g., *People v. Concha* (2009) 47 Cal.4th 653, 660 [express malice]; *People v. Taylor* (2004) 32 Cal.4th 863, 868 [implied malice].)

Iniguez also argues that the provocative act doctrine "incorporates" the natural and probable consequences theory because it requires a showing that the killing was the natural and probable consequence of a defendant's provocative act. This argument has been persuasively addressed and rejected by prior opinions. "Consideration of the natural and probable consequence of the defendant's conduct in the context of provocative murder, as with any

---

[2]      *Gilbert* is often cited for its discussion of provocative act murder, notwithstanding the fact that the United States Supreme Court later vacated its judgment on unrelated grounds. (See *Gilbert v. California* (1967) 388 U.S. 263, 272; see also *Mancilla, supra*, 67 Cal.App.5th at p. 865, fn. 3 [describing *Gilbert*'s history].)

case of implied malice murder, relates to proximate cause—that is to the actus reus element of the crime, not the mens rea element that was the focus of Senate Bill 1437. [Citations.] '[I]n any provocative act case, where by definition an intermediary's act killed the victim, an important question will be whether the defendant's conduct proximately caused the death. [Citation.] The Court's analysis of proximate cause in terms of foreseeability of the natural and probable consequences of the defendant's malicious conduct does not somehow bring a provocative act killing within the malice-free natural and probable consequences doctrine.' " (*Mancilla, supra,* 67 Cal.App.5th at p. 868, fn. omitted; accord, *Swanson, supra,* 57 Cal.App.5th at p. 614, review granted; *Johnson, supra,* 57 Cal.App.5th at pp. 267-268; *Lee, supra,* 49 Cal.App.5th at p. 266, review granted; see *Soto, supra,* 51 Cal.App.5th at pp. 1056, 1059, review granted.)[3]

Finally, we reject Iniguez's claim that the exclusion of the provocative act doctrine from Senate Bill No. 1437 violates his right to equal protection of the laws. "The concept of equal treatment under the laws means that persons similarly situated regarding the legitimate purpose of the law should receive like treatment. [Citation.] ' "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' " (*People v. Morales* (2016)

---

3    Iniguez's reliance on *People v. Larios* (2019) 42 Cal.App.5th 956, 964, review granted February 26, 2020, S259983, is likewise unavailing because it considered a conviction under the natural and probable consequences theory of murder, not the provocative act doctrine. Unlike in *Larios*, Iniguez's conviction is based on his own actions and his own subjective mens rea.

11

63 Cal.4th 399, 408.) Provocative act defendants like Iniguez are not similarly situated to defendants convicted under the natural and probable consequences theory because provocative act defendants must act with malice. (*Mancilla*, *supra*, 67 Cal.App.5th at pp. 869-870; *Johnson*, *supra*, 57 Cal.App.5th at pp. 270-271.) Even if they were similarly situated, the Legislature need only have a rational basis for treating the two groups differently, as Iniguez acknowledges. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 837-838.) The Legislature could reasonably conclude that provocative act defendants are more culpable than defendants convicted under the theory of natural and probable consequences because the provocative act defendants acted with malice, and therefore they should remain subject to liability for murder. Iniguez's claim that provocative act defendants are less culpable because the provocative act doctrine only applies when an *accomplice* is killed is unpersuasive because the doctrine is not so limited. (See, e.g., *People v. Cervantes* (2001) 26 Cal.4th 860, 867 [doctrine applies where a third party kills "the perpetrator's accomplice or an innocent bystander"].) Iniguez has not shown the court erred by instructing the jury on murder under the provocative act doctrine.

II

*Use of Juvenile Adjudications in Sentencing*

Iniguez contends the court violated his right to a jury trial, as interpreted by *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), by using his prior juvenile delinquency adjudication for robbery to increase his sentence under the Three Strikes law. This contention presents a legal issue that we review de novo. (See *People v. Quiroz* (2013) 215 Cal.App.4th 65, 73; *People v. Coelho* (2001) 89 Cal.App.4th 861, 878.)

12

As Iniguez acknowledges, our Supreme Court considered and rejected his contention in *People v. Nguyen* (2009) 46 Cal.4th 1007, 1012 (*Nguyen*). Iniguez argues that we are not bound by *Nguyen* because subsequent opinions by our Supreme Court and the United States Supreme Court have fatally undermined its reasoning. (See *People v. Saez* (2015) 237 Cal.App.4th 1177, 1207 [declining to follow otherwise-binding precedent in another context]; *In re Joshua J.* (2005) 129 Cal.App.4th 359, 363-364 [same].) We disagree. *Nguyen* remains good law that we are bound to follow. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

"California's 'Three Strikes' law [citations] increases the maximum sentence for an adult felony offense upon proof that the defendant has suffered one or more qualifying 'prior felony convictions'—a term that specifically includes certain prior criminal adjudications sustained by defendant, while a minor, under the juvenile court law." (*Nguyen*, *supra*, 46 Cal.4th at p. 1010, fn. omitted.)

"A series of United States Supreme Court decisions, beginning with *Apprendi* . . . , establishes an adult criminal defendant's general right, under the Fifth, Sixth, and Fourteenth Amendments, to a *jury* finding beyond reasonable doubt of any fact used to increase the sentence for a felony conviction beyond the maximum term permitted by conviction of the charged offense alone." (*Nguyen*, *supra*, 46 Cal.4th at p. 1010.) *Apprendi* established an exception to this jury trial requirement for the fact of a prior conviction (*Apprendi*, *supra*, 530 U.S. at p. 490), although California affords a defendant the statutory right to a jury trial on "whether or not [he] has suffered the prior conviction" (§ 1025, subd. (b); see § 1158; *Nguyen*, at p. 1011).

The defendant in *Nguyen* seized on *Apprendi*'s prior conviction exception to argue that "the *Apprendi* rule barred use of the prior juvenile

13

adjudication to enhance his maximum sentence in the current case because the prior *juvenile proceeding*, though it included most constitutional guarantees attendant upon adult criminal proceedings, did not afford him the right to a jury trial." (*Nguyen, supra*, 46 Cal.4th at p. 1011.) Our Supreme Court disagreed, for two main reasons.

First, by its own terms, *Apprendi* did not prohibit the use of a prior juvenile adjudication to increase a criminal defendant's sentence. "[T]he high court determined in *Apprendi* that '[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' [Citation.] Thus, under *Apprendi*, any 'fact' that allows enhancement of an adult defendant's maximum sentence *for the current offense* must, unless the defendant waives his jury-trial right, be determined by a jury *in the current case*." (*Nguyen, supra*, 46 Cal.4th at p. 1015.) "The statutorily relevant sentencing 'fact' in this case is whether defendant's record includes a prior adjudication of criminal conduct that qualifies, under the Three Strikes law, as a basis for enhancing his current sentence. Aside from any exception that might apply here, the literal rule of *Apprendi* thus required only that a jury in the current proceeding determine the *existence* of such an alleged prior adjudication." (*Ibid.*, italics added.) Again, setting aside any exception, California affords defendants such a jury right by statute. (§§ 1025, subd. (b), 1158; *Nguyen*, at p. 1015.)[4]

Second, neither *Apprendi* nor any other Supreme Court decision implies that a prior nonjury juvenile adjudication cannot be used to increase an adult defendant's sentence, if the prior juvenile proceeding otherwise

---

[4]     In the trial court, Iniguez waived his right to a jury trial and admitted suffering a prior juvenile adjudication for robbery.

complied with the Constitution. "Like prior adult criminal convictions, such prior juvenile judgments do not involve facts about the current offense that were withheld from a jury in the current case, but instead concern the defendant's *recidivism*—i.e., his or her status as a *repeat offender*—a basis on which courts, acting without juries, traditionally have imposed harsher sentences. Moreover, the prior criminal misconduct establishing this recidivism was previously and reliably adjudicated in proceedings that included all the procedural protections the Constitution requires *for such proceedings*—indeed, every substantial safeguard required in an adult criminal trial *except* the right to a jury. Use of such reliably obtained juvenile judgments of prior criminality to enhance later adult sentences does not offend an *adult defendant's* constitutional right to a jury trial in an adult criminal proceeding. Conversely, it makes little sense to conclude, under *Apprendi*, that a judgment of juvenile criminality which the Constitution deemed fair and reliable enough, when rendered, to justify confinement of the minor in a correctional institution is nonetheless constitutionally inadequate for later use to establish the same individual's recidivism as the basis for an enhanced adult sentence. Such a determination would preclude a rational and probative basis for increasing an adult offender's sentence—that he or she was not deterred from criminal behavior by a youthful brush with the law—unless juveniles were afforded a right to jury trial, *which the Constitution does not require*." (*Nguyen, supra*, 46 Cal.4th at pp. 1021-1022.)

Iniguez cites three decisions as undermining *Nguyen*'s holding: *Mathis v. United States* (2016) 579 U.S. __ [136 S.Ct. 2243], *Descamps v. United States* (2013) 570 U.S. 254, and *People v. Gallardo* (2017) 4 Cal.5th 120 (*Gallardo*). These decisions considered whether and to what extent the sentencing court could examine the factual circumstances underlying a prior

15

conviction—not merely the fact of the prior conviction itself—to determine whether the prior conviction qualified as a conviction that could increase a defendant's punishment under either federal or California law. (See *Mathis*, at p. __ [p. 2251]; *Descamps*, at pp. 258-259; *Gallardo*, at p. 136.) The import of these decisions is that a sentencing court cannot examine for itself the facts underlying the conviction: "The jury trial right is violated when a court adds extra punishment based on factfinding that goes 'beyond merely identifying a prior conviction' by 'try[ing] to discern what a trial showed, or a plea proceeding revealed, about the defendant's underlying conduct.' " (*Gallardo*, at p. 135.) "[W]hen the sentencing court must rely on a finding regarding the defendant's conduct, but the jury did not necessarily make that finding (or the defendant did not admit to that fact), the defendant's Sixth Amendment rights are violated." (*Ibid.*)

By contrast, the question here, as in *Nguyen*, is not whether Iniguez's prior adjudication for robbery qualifies as a "strike" under the Three Strikes law based on its underlying factual circumstances. The question is only whether he suffered the adjudication: "The statutorily relevant sentencing 'fact' in this case is whether defendant's record includes a prior adjudication of criminal conduct that qualifies, under the Three Strikes law, as a basis for enhancing his current sentence." (*Nguyen*, *supra*, 46 Cal.4th at p. 1015.) The sentencing court did not have any reason or opportunity to examine its underlying factual circumstances. The limitations on such examination in *Mathis*, *Descamps*, and *Gallardo* are therefore inapposite. Indeed, in an opinion decided after *Mathis* and *Descamps*, our Supreme Court expressly declined to reconsider *Nguyen*. (*People v. Landry* (2016) 2 Cal.5th 52, 117, fn. 18.)

16

Iniguez claims, "The import of *Descamps*, *Mathis*, and *Gallardo* is that a sentencing court is allowed to use a prior conviction to enhance a sentence only when the defendant had the right to a jury trial in the prior proceeding." We disagree. The focus of these decisions—and *Apprendi* itself—is a defendant's jury trial right in the *current* proceeding, since that is where the increased sentence may be imposed. Iniguez points to our Supreme Court's comment in *Gallardo* that a sentencing court's role is "limited to identifying those facts that were established by virtue of the conviction itself—that is, facts the *jury* was necessarily required to find to render a guilty verdict, or that the defendant admitted as the factual basis for a guilty plea." (*Gallardo*, *supra*, 4 Cal.5th at p. 136, fn. omitted, italics added.) But this comment was made in the context of prior adult conviction, not a juvenile adjudication. And it presupposes that the underlying facts of a defendant's conviction were relevant to the imposition of an increased sentence. Where, as here, it is the fact of the prior conviction or adjudication that is dispositive, the sentencing court has no occasion to engage in the factual identification or examination discussed in *Gallardo*. We express no opinion whether and under what circumstances the Sixth Amendment would require a jury trial if the facts underlying Iniguez's juvenile adjudication were relevant to the imposition of an increased sentence.

### III

### *Custody Credits*

Iniguez contends the court miscalculated his custody credits because its calculation began the day after his arrest. He argues that his custody credits must begin on the day of his arrest. This court considered and rejected such an argument in *People v. Ravaux* (2006) 142 Cal.App.4th 914, and Iniguez offers no compelling reason to depart from that precedent.

17

Iniguez cites several opinions that state, without explanation, that a defendant is entitled to custody credits beginning on the date of his arrest. (See, e.g., *People v. Valdes* (2020) 53 Cal.App.5th 953, 955; *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.)  These opinions do not appear to have considered whether calculation of custody credits could begin on a date other than a defendant's arrest.  " 'It is axiomatic that cases are not authority for propositions not considered.' " (*People v. Avila* (2006) 38 Cal.4th 491, 566.)  Other than citing these opinions, Iniguez does not explain why *Ravaux* was wrongly decided.  He does not cite the relevant statute or discuss how it should be interpreted.  His argument is therefore unpersuasive.[5]

---

[5]     Iniguez notes there is no evidence in the record regarding the date on which he was booked into jail.  On a silent record, however, we must presume that the judgment is correct.  (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *People v. Leonard* (2014) 228 Cal.App.4th 465, 478.)  Our conclusion is without prejudice to further proceedings in the trial court (e.g., an appropriate motion or petition for writ of habeas corpus) if Iniguez were in fact booked into jail on the same day as his arrest and, under *Ravaux*, he would be entitled to an additional day of custody credits.

## DISPOSITION

The judgment is affirmed.


GUERRERO, J.

WE CONCUR:


HALLER, Acting P. J.


DATO, J.